Filed 6/26/25  P. v. Vue CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHINNAWAT VUE,<br><br>Defendant and Appellant. | F086365<br><br>(Super. Ct. No. F16901621)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

A jury convicted defendant Chinnawat Vue of first degree murder of his wife after he admitted to the police he killed her by stabbing her multiple times.  The jury also found true an allegation defendant used a deadly weapon during the commission of the

offense.  Defendant was sentenced to 25 years to life for the murder plus one year for the deadly weapon enhancement.  The defense at trial was defendant was provoked.

On appeal, defendant contends the court prejudicially erred by failing to instruct the jury that provocation must be determined based upon a subjective test when considering whether it negated defendant's mental state for first degree murder and reduced the offense to second degree murder.  He argues the court also erred by admitting evidence of a prior uncharged act of domestic violence that was alleged to have been committed by defendant against his child and by failing to sua sponte instruct the jury with CALCRIM No. 852A regarding the use of uncharged domestic violence evidence. If either instructional issue is deemed forfeited, defendant asserts his counsel provided ineffective assistance.  Finally, he contends his presentence custody credits are incorrect and must be updated.  The People agree defendant's custody credits must be modified but otherwise dispute defendant's contentions.

We direct the court to prepare an amended abstract of judgment that reflects defendant's updated custody credits.  In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

### Charges

Defendant was charged with murdering his wife, Xia Vang (the victim), on March 8, 2016 (Pen. Code, § 187, subd. (a); count 1).  It was further alleged defendant personally used a deadly and dangerous weapon, a knife, during the commission of the offense (§ 12022, subd. (b)(1)).  (Undesignated statutory references are to the Penal Code.)

### Prosecution Evidence

#### Killing of the Victim and Law Enforcement Response

On March 8, 2016, at 8:11 a.m., Officer Michael Potts responded to a residence in Fresno.  When he arrived, several people were outside in front of the house next door. Potts and his supervisor went in the house.  There was blood on the floor leading to the

2.

first bedroom.  There was a red substance that looked like blood on the bedroom door, door handle, light switch, and the mattress in the room.  The officers located the victim on the side of the bed in a blanket; she was deceased.  Money, including hundred dollar bills, was found scattered on the bed and near the victim on the floor.  The room was "very disorderly and looked like a struggle had taken place.  Things were a mess."  In the primary bathroom, there appeared to be blood on the toilet, floor, sink, trash can, and cabinet.  There was a trail of blood through the kitchen leading to the door into the garage.  In the garage, there was a large spot of blood and bloody clothes hanging from the rafters.  Police recovered a bloody kitchen knife from under the victim's body.  It matched the description of the knife defendant later provided.

Officer Loren Kasten contacted the victim's mother, Ge Her, in the driveway of her residence next door.  Kasten was with an officer who translated during the interaction because Ge Her only spoke Hmong.  Ge Her reported defendant had taken the victim (defendant's wife) from Ge Her's house on March 4, 2016, four days earlier.  Defendant went to Ge Her's house and the victim refused to stand up, so he grabbed her by her feet and dragged her out of the house through the front door while the victim was yelling and screaming.  Defendant put the victim in his truck, and he threatened to harm her if she exited.  He told the victim he was going to take her to her boyfriend's house and have them get married so she would stop going back and forth.  Ge Her reported that at around 10:00 a.m. that day, she received a phone call from defendant, and he told her if he and the victim did not return, "for her to take care of the children."

At the scene, Officer Potts contacted Lee Vang, defendant's friend, who reported defendant told him he killed the victim and was going to kill himself but failed.  Defendant had sent Lee Vang a photograph earlier that morning.  John Vang, who identified himself as defendant's brother, also stated defendant had texted him a photograph that showed defendant's injury.  The People entered the photograph into evidence.

3.

Defendant was arrested in the mountains. He had a laceration to his throat area that needed medical attention, so he was transported to a hospital for treatment. Two days later he was cleared from the hospital and transferred to the police department. Detective Leonard Cabrera conducted a recorded interview with defendant at the police department. The recorded interview was introduced as an exhibit and played for the jury.

During the interview, defendant admitted to killing the victim with a knife. He told the police the victim had been seeing another man, a doctor Vang L. (also referred to as Vang L.M.), and he "caught" her. He stated the victim did not care about her family and just used the house to sleep. He stated he took care of the family and supported the victim in going to school and she broke his heart.

Defendant reported he got home around 9:00 p.m. on March 8, 2016, and his minor son Ja. and the victim were home. Defendant tried to talk to the victim to ask her if she had been out all day and she responded that it was too late to talk, and they would talk in the morning. Defendant started crying because he loved the victim and she wanted to be with someone else. He told her "if she do like that, … I kill her first and I kill myself." The victim told him he could not kill her because he loved her. Defendant went to the kitchen and got two knives. He kissed the victim and showed her the knife. She threw the phone she was using to text someone and screamed. He told her if "I can't have her I'm not going to let her go. I'm going to kill her first and kill myself." He then hit her in the neck first with his right hand and then began to stab her. He stated he stabbed her 20 times on her neck and could not count how many times he stabbed her; it was "a lot." Defendant reported he then tried to kill himself after. When he was unsuccessful, he drove away and called his mother and brother and told them what he had done. Defendant also sent photographs of himself by text to two people, Lee Vang and John Vang, and told them he killed his wife. He also admitted to having punched the victim twice in the face in December 2015.

Forensic pathologist Dr. Michael Chambliss testified regarding the autopsy performed on the victim's body by Dr. Venu Gopal, who died before the trial. Dr. Chambliss testified the cause of the victim's death was determined to be "multiple stab and incised wounds" that "produced perforations of the jugular veins and the carotid arteries … in the neck area." The People introduced photographs of the victim's injuries, including multiple cut injuries to the victim's neck, chest area, left hand, left arm, and also to her face. She had wounds on the palm of her hand that were consistent with defense wounds.

**Other Prosecution Evidence**

*Daisy Vang's Testimony*

At trial, the victim's older sister, Daisy Vang testified. She stated she and the victim were best friends; they lived together with their parents until the victim got married. The victim married defendant in 2009, and they lived with defendant's parents. Daisy was not close to defendant. She testified defendant "likes drinking" at family gatherings. And the victim "would do the chores like cleaning, helping the family, and babysitting" her own children. Daisy described the victim as a "loving mother" who "always put her children first." She stated defendant would drink beer every day after work and it was an issue in his and the victim's marriage. He and the victim had three children together.

Daisy testified that the victim was attending Fresno City College studying social work around 2015 and 2016. She observed the victim and defendant having problems related to finances and childcare while the victim was in school. Defendant controlled the money and sometimes the victim would go to school without money to buy lunch. She would ask Daisy or their mother for money. The victim was doing an internship at the Fresno Center's Living Well Center at the end of 2015, which was required for her to get her associate's degree. In February 2016, the victim wanted to move back in with her parents "because she was fearful for her life," but her parents would not allow it; their

5.

father "was a very traditional Hmong man." The victim began staying with Daisy. After about a week, defendant went to Daisy's house and told her that he talked to her parents and he and the victim agreed to be together again. He took all of the victim's belongings and put them in the car. However, the victim had not agreed to go back to defendant.

In March 2016, Daisy witnessed the victim sleeping on the couch at their mother's house. Defendant came in; he was angry and yelling at the victim. He grabbed the victim by the ankle and dragged her out of the door. He told her if she did not go with him he was going to kill her. He put the victim in the car and drove away with her. The victim was crying, saying she did not want to go with him. Neither Daisy, her mother, nor anyone else called the police. When Daisy returned home from school and arrived at her mother's house around 5:00 p.m. she became concerned because the victim was not home. Defendant returned home and said he had lost the victim. Daisy's parents and defendant went to the mountains to look for the victim but then returned around 7:00 p.m. when they could not find her. Daisy told her mother she was going to call the police if there was no sign of the victim within 30 minutes. The victim then arrived at Daisy's house without shoes and looking distressed; she was crying. A truck was outside that appeared to have dropped the victim off.

Daisy Vang explained that in Hmong culture, elder meetings involve the Hmong leaders in the clan, who are males, and both parents from both sides of a couple who has issues. Generally, during an elder meeting in which the wife is present, "the elderly will encourage the wife to be patient; to become a better mom, better wife and to listen to the husband," not to leave the family. It was taboo in Hmong culture for a woman to have an affair, but men were permitted to have multiple relationships and controlled the family, including the woman and children. Before the victim died, there were elder meetings held focused on the victim and defendant. The victim wanted to leave her marriage because of domestic violence and substance use.

6.

Daisy testified she did not know the victim was having an affair; the victim had not told her. On cross-examination, defense counsel asked Daisy if she recalled telling a police officer on March 8, 2016, that the victim was seeing another man and defendant knew about the affair; Daisy stated she did not remember. The defense called the police officer, who testified he spoke with Daisy at the scene after the victim was killed and she reported that the victim was having an affair.

Daisy also testified regarding a prior incident that occurred at the beginning of 2016. During that incident, Daisy was outside when defendant and the victim's young daughter, Je., came out of their house crying with a bloody nose and bruises or blue and reddish marks on her back. The victim was with Je.; the victim was tearful, crying, and distressed; she told Daisy that defendant had caused the injuries. Daisy had seen Je. about an hour earlier and she was not injured.

### Lee Yang's Testimony and Report to Police

Lee Yang was married to the victim's brother. Lee testified she, her husband, and their daughter were living with the victim, defendant and their two sons and daughter in 2016. In the evening of March 7, 2016, Lee and her daughter were in their bedroom; her husband was working. At some point, defendant came to Lee's room and asked to see her phone; he looked at it, gave it back to her, and left. Lee stated the victim would ask to use her phone so she would let her; she did not know why the victim wanted to use it. Lee did not recall reporting to Detective Cabrera that the victim had used her phone in the past to call her boyfriend, but she testified that if she said that, it was "probably true." Lee reported to Detective Cabrera during an interview that she heard an argument 30 minutes after defendant checked her phone. Lee testified she did not hear anything when she went to bed but at some point she heard what sounded like the victim and defendant crying. The next morning, Lee heard defendant get up and drive his car like he normally does when he goes to work.

7.

After defendant left, Lee's mother-in-law was knocking on the door. Lee opened the door and let her in and then returned to her room. She heard her mother-in-law knocking on the victim's bedroom door. Nobody was opening the door, which appeared locked, so Lee retrieved the key to open the door. She unlocked it and her mother-in-law went into the room; Lee stayed by the door. Lee saw the victim's and defendant's son Ja. sleeping on the bed. Lee saw her mother-in-law move a blanket that was on the floor at the base of the bed, jump, and leave the room. She told Lee to call the police and seemed "really scared." The victim's older brother came and retrieved the child and two of defendant's friends arrived.

Lee testified she did not know the victim was having an affair, but she knew the victim and defendant "weren't getting along" and the "elders came to address it." Lee testified defendant "would drink" and "can't control himself"; he would smash things inside their room.

Sergeant (former Detective) Cabrera testified he interviewed Lee Yang and she told him the victim told her about her boyfriend. Lee reported defendant took away the victim's phone a month earlier so the victim would use Lee's phone to communicate with her boyfriend. He also testified Lee reported defendant hit the victim, and Lee's husband tried to stop him but he did not stop. Lee had testified she did not recall this but stated it was "probably true." Cabrera testified Lee also reported witnessing seven or eight acts of domestic violence between defendant and the victim. She described defendant as "often upset or drunk," and "he would often strike her and assault her." When Cabrera asked Lee why she believed the killing took place, she stated the couple were having marital problems that had to do with the victim having a boyfriend.

### Ge Her's Testimony

The victim's mother, Ge Her, testified the victim and defendant got married in 2009 when the victim was 16. The victim was pregnant before they got married. In 2014, defendant and the victim lived with Ge Her for two months before they moved to

8.

the house next door to hers. Ge Her testified defendant's drinking was one of the problems in their marriage, and "when he was drunk then he came in, he got angry and he'd beat up the children." She said this happened two or three times and she saw him hit his daughter in the nose and it started bleeding.

Ge Her testified the victim was sleeping over at her house sometime in February 2016.[1] Defendant came over and the victim refused to go with him back to their house. Defendant brought a knife to the house and said if the victim did not come out he would stab himself with the knife. He also threatened to kill the victim. Ge Her's husband got the knife away from defendant, but he and Ge Her told the victim to go with defendant to his house. The victim went with him, and she and defendant lived together after that.

Thereafter, an elder meeting was held at Ge Her's house during which defendant's older brothers and their wives, Ge Her's husband and relatives, "and some clan leader" were present. Defendant's brother, Chi Koo, said this was the first time this happened, and all defendant's brothers begged for forgiveness and asked that the victim go back to defendant.

On March 6, 2016, according to Ge Her, defendant dragged the victim out of Ge Her's house, put her in his vehicle, "and took her to the mountain[s] and tried to kill her." Ge Her told defendant to stop, and defendant said he was "just going to take her to show me where the boyfriend's house is." Ge Her and her son tried to follow defendant's car, but they lost track of him. Around 2:00, defendant called Ge Her and told her he had taken the victim to the top of the mountain. He said he was very tired, had fallen asleep, and when he woke up he could not find the victim. Defendant said he was coming back home because he could not find her. Ge Her, her husband, and her son went to the mountains and called the victim's name but she did not answer. They went back home

---

[1]Ge Her later testified she did not take note of the date the knife incident occurred and did not recall previously reporting the incident occurred on December 24, 2015.

and around 8 or 9 that evening they received a phone call and learned the victim was home.

Ge Her testified she did not know anything about the victim having a boyfriend; she only heard it from defendant. Ge Her became aware defendant was accusing the victim of having a boyfriend a month or two before her death. Ge Her stated she told the woman who lived across the street not to give her phone to the victim, but she denied saying the victim was going to call her boyfriend.[2] Ge Her denied knowing Dr. Vang L.M. However, Officer Kasten testified Ge Her told him the victim met her boyfriend, who was a doctor, while volunteering at the Center for New Americans. Ge Her stated she confronted the victim about the relationship and the victim told her they were just friends.

On March 8, 2016, Ge Her received a call from defendant's brother and went over to the victim's and defendant's house. Lee Yang opened the front door and then unlocked the bedroom door because it was locked. Ge Her saw her grandson Ja. on the bed but she did not see the victim. Then, she noticed something covered with a blanket, picked up the blanket, and she "saw this and the face" and could not look at it. She felt numb and left the bedroom. She asked her son to pick up Ja. from the bed, and he carried Ja. to her house. Defendant's friend arrived at the house and Ge Her asked him to call the police. He showed Ge Her the picture defendant had sent him.

---

[2]The defense called a woman who lived across the street (the neighbor). The neighbor testified that a few days before the killing, the victim had come to her door and asked for the neighbor's phone. The neighbor thought the victim needed help, so she gave the victim her phone. The victim walked to the other side of the driveway with it and seemed withdrawn. Ge Her then approached and told the neighbor not to give the victim her phone because she would use it to call her boyfriend, who was a psychologist. The neighbor testified Ge Her told her the victim had been having an affair for six months, was never home, and neglected her children by leaving with her boyfriend. Ge Her also told the neighbor the victim wanted to leave the children and start a new life with the psychologist. Ge Her also told the neighbor defendant knew about the relationship and was furious.

*Defense Evidence*

Defendant testified on his own behalf. The defense also called multiple witnesses that testified to defendant's good character and family meetings that occurred related to defendant's and the victim's marital issues.

**Defendant's Testimony**

Defendant testified he moved to the United States from Thailand in 2006. He met the victim in high school and they began to like each other. The victim got pregnant with defendant's child while she was still in high school; she was about 16. Defendant and the victim got married in 2009 in Nevada. Their first son was born in November 2009. The victim and defendant were living with defendant's parents at the time. Defendant finished high school in 2010 and went to study at Fresno City College. He also went to the Center for New Americans where there was a social worker who would help him find work. Defendant found work at a supermarket where he worked 10-hour days Monday through Friday and 12 hours on Saturday. The victim and defendant lived with the victim's parents for about two months before they eventually moved into a house next door to them. The victim's brother and his wife, Lee Yang, moved in with them. The victim did a night school program and graduated high school in 2012; she had two children when she graduated and was pregnant with a third child.

In November or December 2015, defendant started working a second job from midnight to 8:30 a.m. five days a week. He testified he would help raise the children and denied ever hitting them. He specifically denied ever making his daughter cry, hitting her, or giving her a bloody nose. Defendant testified he would have a couple of beers with coworkers on Friday after working all week.

Defendant stated he and the victim "were good" until she started her internship at the Center for New Americans in October 2015. Defendant became suspicious when the victim came to pick him up from work and she had been talking on the phone in the parking lot for 30 minutes. When he saw the victim, her face changed. Then, on

11.

November 14th, he saw a text message on the victim's phone before he left for work. The message said, "You must have a sweet dream last night dear. What's the plan for today? I miss you." Defendant got angry and called the number and a man answered. Defendant asked him why he was calling his wife and the man hung up. He asked the victim who the man was and "she said just another guy about your age from Fresno City." Defendant had to go to work so he took the phone with him and left. He called one of his brothers and told him he thought the victim may be having an affair because of the text. Defendant asked for a meeting of the families. A meeting was held with defendant, the victim, and two of defendant's brothers during which he showed the text message but the victim "refused to admit it."

Right before Hmong New Year, the victim "was gone for the whole day." When she came back she and defendant got into a verbal fight. Defendant "slapped her a couple times." The victim "took off" and went to her parents' house. Defendant stated he "did not bring the knife to their house"; he "was having the knife and was standing by [his] house" and "told her if she doesn't come back then [he] was going to kill [himself] with the knife." The victim's father asked defendant for the knife and defendant gave it to him. The victim went back home with defendant that night.

At some point, defendant told the victim's parents the victim was having an affair. They said they would do everything to protect them. They had three or four meetings in January, February, and March with the victim's parents during which the victim was counseled, and the families encouraged the victim to stay in the marriage and with the children. At the end of the meetings the victim agreed to stay in the marriage, but the next day she would say she was not going to stay with defendant. At some point, Ge Her told defendant the victim's boyfriend "is an old man." She told defendant "[h]is name is L[.M.]" and "this is a doctor" who worked for an agency.

Once the victim began the affair, "everything change[d]." Defendant would have to miss work to go pick up his children; the school would call him. He did not know

12.

where the victim was, and the victim would not answer her phone. Two weeks before defendant killed the victim, she admitted she had a boyfriend.

He testified, on March 2, 2016, he arrived at Ge Her's house at around 7:00. He denied dragging the victim but said he "was helping hold her feet" and the victim's brother helped him pull. Defendant was very angry and told Ge Her he was going to take the victim to her boyfriend. He did not know where the boyfriend was, so he took her to "Tollhouse."

He testified he intended to drive off a cliff and kill himself and the victim. He pulled over at a turnout and cried. He asked the victim why she was doing this to him. He told her he could drive off a cliff and they could both die, and the victim got scared. The victim told him to think about the children and he decided not to drive off the cliff. He also threatened the victim with a knife he had in the car. She got out of the car and started to walk away when defendant threatened to light himself on fire and held a shirt that he lit on fire. The victim walked back and put out the fire. At some point, defendant fell asleep. He woke up an hour later and the victim was gone. He drove up and down the mountain several times and could not find her. He called Ge Her and told her the victim had disappeared. Defendant went to Ge Her's house and then went back to the mountain with her, the victim's father, and her brother. They did not find the victim and defendant did not see the victim again until the following evening; the victim went back to live with defendant.

That Sunday, Ge Her called defendant while he was at work, and she told him the victim was talking to her boyfriend on the phone and she wanted defendant to go and take the victim's phone away. Defendant went over and got the victim's phone. That night they had another family meeting during which Christopher and Mai Der Vang were present. At the beginning of the meeting the victim denied having an affair. After they went back and forth, the victim admitted she and Dr. L.M. started a relationship during her internship. They had gone out and had lunch together.

13.

After the family meeting, the victim told Mai Der to call Dr. L.M.'s wife. The victim and Mai Der went outside and talked on the phone. After an hour, defendant went outside and got in the car with the victim and Mai Der and listened to the conversation, which was on speakerphone. Dr. L.M.'s wife told the victim the doctor would treat her well while she is young but he would treat her like a rat when she got older. When defendant got in the back of the car with the victim, the victim grabbed his hand and pulled him close to her. Defendant thought the call would help and the victim would want to come back to stay with him and the children.

Defendant went to work that night and returned home in the morning. "She changed everything. She totally changed." The victim came over to defendant and hugged and kissed him and they "continued this relationship again." Defendant went to work and, at around one, Ge Her called defendant and told him the victim's boyfriend came over and picked her up. Defendant got angry; he was frustrated and hurt. Defendant got off work at 7:30 and went to see his father. Then, he went and had two beers with a coworker and got home around 11. He told his brother-in-law to tell the supervisor he was not going to make it to work that night. The victim was at home. Defendant asked Lee Yang for her phone to see if the victim had been using it; he did not find anything.

Defendant went to his bedroom and asked the victim what she had been doing all day. The victim did not answer; she kept "saying it's late" and she "want[ed] to go to sleep." She turned off the light and defendant asked her why she kept doing this to him and his children. He was not angry; he just felt sad and was crying. The victim's and defendant's three-year-old son was on the bed.

Defendant went to get water and there was a knife by the sink. He "brought the knife back in to threaten her to see what she would do." Defendant denied that he decided then to kill the victim. He testified he just brought the knife "to scare her and to see if she'd be afraid." When the victim saw it, she asked him what he was doing with

14.

the knife. Defendant said, "I could kill you and then kill myself." "She said you couldn't do that. You love me too much. You couldn't do that to me." The victim was holding a phone and went outside the house. Defendant followed her out and when she was coming in she was "just laughing at [him]." She told defendant he was "not [her] husband anymore. The person [who] is my husband is going to come pick me up outside." She said a phrase in Hmong that meant, "You are completely nothing," "you are poor," "[y]ou don't have any money like my boyfriend." Defendant thought "maybe her boyfriend [wa]s waiting for her out there." He believed she was going to leave him because she had gone outside twice.

At around 2:00 a.m., when the victim tried to go out a third time, defendant pulled her back and hugged her. The victim began yelling at him that he was not her husband and her husband was coming, waiting outside. Defendant "was really angry," "crying," "out of it." The victim hit him twice in his private parts and he grabbed her by the neck and pulled her; they were both on the bed. He "was so emotionally distraught and frustrated and angry [he didn't] even know what happened." "I was holding the knife [and] said to her I'm sorry. I love you very much.… And then I took the knife and stabbed her." He "had no sense of time at that moment." He "was overwhelmed with anger and frustration and emotional." The victim tried to block him, and defendant stabbed her. Defendant heard his son say "daddy" and defendant told him to go to bed. The child went and laid down. Around five o'clock, his son asked, "why do you and mommy have so much blood?"

After defendant killed the victim, he wanted to kill himself but he could not find the knife. He went to the kitchen, got another knife, and tried to cut his own throat two times, kissed the victim on her forehead and mouth, and then laid down next to her. He was still breathing when he woke up and saw the clock indicated it was 5:00 a.m. Defendant noticed the victim's body had begun to cool. He went into the garage to hang himself but he "couldn't really tell what [he] was doing." He went to the car, called his

15.

mother and brother Roger, and told them he killed the victim. Defendant told Roger he was angry and made a mistake.

### Mai Der Vang's and Christopher Vang's Testimony

Mai Der Vang testified she met defendant and the victim through the Hmong community in Fresno. The day before the killing, Mai Der and her husband went over to talk to the victim and defendant; several of the victim's and defendant's relatives were present. Mai Der heard Ge Her say the victim was having an affair. Mai Der told the victim that Dr. L.M.'s wife is her best friend. After the meeting, the victim and Mai Der were in Mai Der's car when Mai Der called Dr. L.M.'s wife on speakerphone. Dr. L.M.'s wife and the victim spoke and, at some point, defendant also got in the car.

Christopher Vang, Mai Der's husband, testified defendant called and asked him to come over to talk to him and his wife about an issue; defendant's wife "was having an affair." Christopher and Mai Der went to defendant's house where relatives were present; the meeting took place two days before the victim was killed. At the meeting, the victim's mother, Ge Her, stated the victim was having an affair and she saw the victim's boyfriend drop her off to their house twice. After the meeting, Christopher stood by the car while his wife and the victim were on the phone inside the car. He did not recall defendant getting into the car with Mai Der and the victim. The next day defendant called Christopher; "[The victim] had packed her stuff."

### Dr. Vang L.M.'s Testimony

The defense also called Vang L.M. Dr. L.M testified he is a psychologist who was previously the director at the Center for New Americans. He stated he vaguely remembered the victim; she was a student observer. He denied having a personal relationship with her or being her mentor. He stated he met her at the supermarket to talk "[w]hen she insisted she had some family problem." The victim told him she was unhappy in her relationship and had "domestic quarrels." She told him defendant had threatened her with a knife but Dr. L.M. did not believe her and "told her to take

16.

precaution." The victim tried to contact him; but he "had [his] wife so usually … would not respond." He testified he was still married and he and his wife never separated though his wife lived with their son and he lived alone.

**Other Defense Evidence**

Ka Vang, defendant's sister-in-law, testified she worked with defendant for two years at the same supermarket. About a month before the victim was killed, Ka attended a family meeting to discuss defendant's and the victim's marital problems. During the meeting, the victim was told to stop having an affair and defendant was told to be patient. The victim agreed to be faithful, and defendant was happy. After the meeting they went their separate ways. Ka testified defendant was diligent, helpful, generous, and always came to family gatherings before the affair but he became depressed after learning about it. He began to "drink more just to control his temper."

Defendant's older brother Cha Chia Yang, Ka Vang's husband, testified defendant was working two jobs while the victim went to school, and she was unfaithful. Cha Chia attended the family meetings with defendant and the victim and stated the victim agreed during the meetings to stay in the marriage and become a better person. Defendant's boss at the supermarket, testified defendant was an excellent worker and had a really good relationship with the other employee he worked with. At some point, defendant was having childcare issues.

Defendant's other brother Roger Yang also testified. Defendant asked Roger to help resolve a marriage issue he had at the end of 2015 and the beginning of 2016. During the first family meeting, defendant asserted the victim was having an affair; the victim appeared angry and did not talk much. The victim denied having an affair but stated she wanted a divorce. At the end of the meeting, the victim agreed to stay in the marriage. Roger recalled another family meeting during which defendant begged the victim to stop having an affair. The victim agreed to stay married at the end of the meeting. At another meeting, Christopher Vang and his wife Mai Der Vang were

17.

present, and Roger saw the victim speaking with Mai Der. On March 6, 2016, Roger received a call from Ge Her. She asked him to come over because the victim was going to run away with her boyfriend. Then, on the morning of the killing, defendant called Roger and told him he did not know what to do; he had "slashed … sister-in-law and she die," and he was in the garage, slashed his own throat, and was also going to die.

Defendant's mother Mor Vue also testified defendant called her that day and told her he had killed his wife and "slit" himself. He told her they got into an argument because the victim's boyfriend called. Defendant got "very angry" and "killed her." Mor reported to the defense investigator that defendant told her the victim had punched him twice in the penis and tried to leave the room.

*Verdict*

Following the presentation of evidence, the jury convicted defendant of first degree murder (§ 187, subd. (a)) and found true an allegation he personally used a deadly and dangerous weapon, to wit, a knife, within the meaning of section 12022, subdivision (b)(1).

The court sentenced defendant to 25 years to life enhanced by one year pursuant to section 12022, subdivision (b)(1). The court found it was "not in the furtherance of justice to strike the one-year enhancement." The court further stated, "if there is any sentencing change in the future regarding the 25 years to life mandatory sentence for first degree murder, the Court would not under circumstances [*sic*] exercise its discretion to impose a different sentence." The abstract of judgment reflects 2,554 total credits under "Credit For Time Served."

## DISCUSSION

Defendant raises multiple challenges to his conviction. We discuss and reject each contention in turn.

18.

# I.     Provocation Instruction

Defendant first argues the court prejudicially erred by failing to instruct the jury that the test for determining whether provocation negates the specific intent required for first degree murder is subjective.

## A.     Relevant Factual Background

The jury was instructed on first and second degree murder (CALCRIM Nos. 520 & 521) and on the lesser offense of voluntary manslaughter based on heat of passion (CALCRIM No. 570).  Pursuant to CALCRIM No. 521, the court instructed the jury that the People must prove defendant "acted willfully, deliberately, and with premeditation" for defendant to be guilty of first degree murder.  It explained, in part, "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly."

The court instructed the jury on provocation with CALCRIM No. 522 (Provocation:  Effect on Degree of Murder) as follows:

> "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.
>
> "If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The court also instructed the jury with CALCRIM No. 570 on "Voluntary Manslaughter:  Heat of Passion–Lesser Included Offense" as follows:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or … in the heat of passion if:  The defendant was provoked; as a result of the provocation, the defendant acted rashly and under the influence of an intense emotion that obscured his reasoning or judgment; and the provocation would have caused a person of average disposition to act

19.

rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation or reflection. In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.

"While no specific type of provocation is required slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient consider whether a person of average disposition in the same situation, knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for an ordinary [person] of average disposition to cool off and regain his clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of sudden quarrel or heat of passion. If the People have not met this burden you must find the defendant not guilty of murder."

Defendant did not request a pinpoint instruction on provocation, or any additional instructions amplifying or clarifying the provocation necessary to negate premeditation and deliberation such that it would reduce first degree murder to second degree murder.

During closing argument, the prosecutor argued defendant acted with premeditation and deliberation and, thus, committed first degree murder. The prosecutor asserted defendant admitted he intended to kill the victim during the March 2d incident, before the murder. "[T]his wasn't a sudden decision. This is something that he had been thinking about and pondering." The prosecutor argued defendant leaving his bedroom, walking to the kitchen, getting a knife, and taking that knife all the way back to the bedroom is evidence of premeditation and deliberation. She asserted, defendant "stabbed

20.

[the victim] over and over and over and over and over. And imagine how long it must have taken to stab her as many times as he did and kill her." She argued that "first-degree murder with a knife ha[d] been proven beyond a reasonable doubt."

The prosecutor argued defendant was not guilty of voluntary manslaughter. She asserted, "This is not … a situation where the defendant walks into his bedroom and he sees [the victim] in bed with Dr. L[.]" "And this was not a situation where the defendant was just learning about the affair, or what he believed it to be this full-fledged affair. We know, from the testimony, that the defendant knew about it or thought that it was happening back in October of 2015, which is about four months prior.… So this is not the situation where he first learns of it or he has this kind of situation where he would be so angry and so upset and lose all control and kill her in that moment." With regard to provocation, the prosecutor asserted, "the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

In closing argument, defense counsel noted CALCRIM No. 522 provides that provocation may "reduce a murder from first-degree." He argued, "[T]his is a little different from the way that [the prosecutor] described it to you." Counsel argued, "Even if you thought there was first-degree, provocation may reduce it back down. And if there's enough provocation, the special kind of provocation, that can reduce murder to manslaughter." He asserted the evidence is "clear that [defendant] was provoked." He argued: "This was done very rashly. It was done very impulsively in that moment. His own child was on the bed. Whatever it was, the last thing that set him off, it really set him off completely."

### B. Standard of Review and Applicable Law

"Provocation may … reduce murder from first to second degree." (*People v. Rivera* (2019) 7 Cal.5th 306, 328; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 384.) It has been held "a subjective test applies to provocation as a basis to reduce malice

murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime. [Citation.] But more is required to reduce malice murder to voluntary manslaughter. For that, an objective test also applies: the provocation must be so great that, in the words of CALCRIM No. 570, it 'would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.'" (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000–1001; see *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

We review a claim of instructional error de novo. (*People v. Parker* (2022) 13 Cal.5th 1, 66.) "A trial court 'is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.'" (*Ibid.*) "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67–68; see *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 ["relevant inquiry … is whether, 'in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to [the] defendant's prejudice'"].) "'"[W]e must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]""" (*Sattiewhite*, *supra*, at p. 475.)

Notably, "an instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation … is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory. [Citation.] The trial court is not required to give such an instruction sua sponte." (*People v. Rivera*, *supra*, 7 Cal.5th at p. 328; accord, *People v. Thomas*, *supra*, 14 Cal.5th at p. 384.)

## C.    Analysis

Defendant argues the instructions, including CALCRIM Nos. 520 (first or second degree murder), 521 (first degree murder), 522 (provocation:  effect on degree of murder), and 570 (voluntary manslaughter), did not correctly or adequately describe provocation in the context of second degree murder.  He acknowledges the California Supreme Court "has held that a trial court does not have a duty to instruct the jury sua sponte on provocation in the context of second degree murder because it is considered a pinpoint instruction."  But he contends, "here, once the court decided to instruct on the effect of provocation on the degree of murder, [namely, CALCRIM No. 522,] it had a duty to give a correct and adequate instruction that provided a legal definition of the term 'provocation.'"  He asserts the court had a sua sponte duty to give an amplifying or clarifying instruction because the term "provocation" in the context of second degree murder has a technical meaning peculiar to the law that relates to *the effect* of the provocation on the defendant's subjective state of mind, rather than to the nature of the provocation.  He argues the alleged instructional error constituted federal constitutional error because it relieved the prosecution of its burden to prove malice beyond a reasonable doubt and affected his right to present a defense.  Though there is no indication defendant's counsel objected to the instruction, requested any modifications thereto, or requested the court to give an instruction on the test for provocation that applies in reducing a murder to second degree, defendant asserts the trial court had a sua sponte duty to instruct the jury "on the legal definition of 'provocation,'" and the failure to do so affected his substantial rights so no objection was needed.  He argues, because the instructional error implicates his constitutional rights, it is judged under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24, which requires reversal unless the People can prove beyond a reasonable doubt the error did not contribute to the verdict.  He also contends the record supports a finding the alleged error was not harmless under *People v. Watson* (1956) 46 Cal.2d 818.  Alternatively, if the issue is deemed forfeited,

he contends his counsel provided ineffective assistance by failing to object to the provocation instructions or proposing a pinpoint instruction.

The People respond, this issue was forfeited based on counsel's failure to object. They dispute defendant's claim the trial court had a sua sponte duty to instruct the jury with the "legal definition of 'provocation'" because the term "provocation" in the context of reducing first degree murder to second degree murder has a technical meaning peculiar to the law because it relates to the effect of the provocation rather than its nature. They assert defendant's claim lacks legal support. Rather, "the effect of a provocation does not change the meaning of the term 'provocation' itself or give it a technical meaning peculiar to the law"; that is, "provocation" and "the reaction to provocation … are two distinct concepts." The People further assert the trial court correctly and fully instructed the jury on the applicable legal principles, and the failure to give a sua sponte instruction did not affect defendant's substantial rights because it did not result in a miscarriage of justice. In addition, they assert defendant's claim fails on its merits and was harmless because "there was overwhelming proof that [defendant] killed [the victim] with malice and with premeditation and deliberation irrespective of any possible claim of provocation." They also deny that defense counsel's failure to request a pinpoint instruction constituted ineffective assistance. We agree with the People and reject defendant's contentions.

Initially, "[w]hen a word or phrase "'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.'" [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from it nonlegal meaning." (*People v. Estrada* (1995) 11 Cal.4th 568, 574.) Provocation means "something that provokes, arouses, or stimulates"; provoke means "to arouse to a feeling or action[;] … to incite to anger." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 938; see *People v. Ward*

24.

(2005) 36 Cal.4th 186, 215 ["The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state"].)

With these principles in mind, we reject defendant's contention the court erred in failing to sua sponte instruct the jury further about provocation in the context of reducing first degree murder to second degree murder absent a request for a pinpoint instruction by defense counsel. Defendant contends "the meaning of provocation in the context of second degree murder relates to *the effect* of the provocation, which is the impact of the provocation on the defendant's *subjective* state of mind." But this argument is misplaced. Provocation, when considered in the context of reducing first degree murder to second, does not have a technical meaning peculiar to the law that differs from its commonly understood meaning. Indeed, *the effect* of provocation is not included in the definition of the term and does not alter the meaning of the term. That is, defendant fails to establish, and we cannot conclude, the term "provocation" when considered in this context, has a definition that differs from its nonlegal meaning. (See *People v. Hernandez*, *supra*, 183 Cal.App.4th at p. 1334; see *People v. Estrada*, *supra*, 11 Cal.4th at p. 574.) To the contrary, the commonly understood meaning applies when considering provocation in the context of reducing first degree murder to second degree murder.

"Provocation in this context is not a 'defense' but merely a theory of reasonable doubt as to required elements of first degree murder. [Citation.] Because an instruction on provocation relates to the legal elements of premeditation and deliberation, it is a '"pinpoint instruction"' that a court need not give on its own motion." (*People v. Ocegueda* (2023) 92 Cal.App.5th 548, 557; accord, *People v. Hernandez*, *supra*, 183 Cal.App.4th at p. 1333 ["an instruction on provocation for second degree murder is a pinpoint instruction that need not be given sua sponte by the trial court"].) And, "CALCRIM Nos. 521 and 522, taken together, inform[] jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no

25.

premeditation and deliberation.'" (*People v. Jones*, *supra*, 223 Cal.App.4th at p. 1001; see *People v. Hernandez*, *supra*, at p. 1334.) Indeed, as defendant acknowledges, courts have held CALCRIM Nos. 521 and 522—both given here—are correct, and "[t]hey accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed." (*Jones*, *supra*, at p. 1001; see *Hernandez*, *supra*, at pp. 1333–1334.) Thus, contrary to defendant's contention, the given instructions were adequate, and we cannot conclude defendant's rights to a fair trial, to present a defense, and to due process were violated. Accordingly, we reject defendant's contention the court had a sua sponte duty to instruct the jury further regarding provocation in the context of reducing first degree murder to second degree murder.

We also cannot conclude it was reasonably probable the given instructions misled the jury to believe that, to reduce murder from first to second degree, provocation must meet the same objective reasonable person test that leads to a reduction to voluntary manslaughter. As discussed, the jury was instructed on first degree murder with CALCRIM No. 521, which provides in part that for a murder to be first degree, it must be deliberate and premeditated and a "decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." It was also instructed that provocation could reduce the degree of murder, pursuant to CALCRIM No. 522. We cannot conclude the jury would have understood the instructions as saying the test for determining whether a murder is first or second degree is the same as that for determining whether a defendant is guilty of voluntary manslaughter. Rather, the jury was also instructed that for a defendant to be guilty of voluntary manslaughter, the provocation must be of such a kind that a person of average disposition would have been provoked and defendant was subjectively provoked. And we "see no reasonable likelihood that the jury would have construed this language in a voluntary manslaughter instruction to alter the requirement—plainly stated in CALCRIM No. 521—that first degree murder must be

26.

deliberate and premedi[t]ated." (*People v. Ocegueda*, *supra*, 92 Cal.App.5th at p. 559; see *People v. Rogers* (2006) 39 Cal.4th 826, 880 ["In the absence of instructional errors such as were present in [*People v*. ]*Valentine* [(1946) 28 Cal.2d 121], the standard manslaughter instruction is not misleading, because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder"].)

To the extent defendant argues a more specific instruction, namely a pinpoint instruction, should have been given informing the jury that the objective test did not apply to reduction of the degree of murder, defense counsel's failure to request such an instruction forfeited this claim on appeal. (See *People v. Jones*, *supra*, 223 Cal.App.4th at p. 1001; see *People v. Rogers*, *supra*, 39 Cal.4th at pp. 878–879 [CALJIC No. 8.73, which relates evidence of provocation to specific legal issue of premeditation and deliberation is a "pinpoint instruction" that need not be given on court's own motion].) And we cannot conclude defense counsel provided ineffective assistance by failing to request such a pinpoint instruction.

A defendant claiming ineffective assistance of counsel "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.) In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance .…" (*Id.* at p. 689; accord, *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption the challenged action might be considered sound trial strategy under the circumstances. (*Strickland*, *supra*, at p. 689; *Dennis*, *supra*, at p. 541.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.) Additionally, the defendant must also establish prejudice: "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, at p. 694.) "A reasonable probability is a probability sufficient to

27.

undermine confidence in the outcome." (*Ibid.*)  On direct appeal, when no explanation for counsel's conduct can be found in the record, "we must reject the claim [of ineffective assistance of counsel] on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation."  (*People v. Scott* (1997) 15 Cal.4th 1188, 1212; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.)

Here, "counsel could reasonably have concluded the instructions given adequately advised the jury, as we have, and that no further instruction was necessary."  (*People v. Ocegueda*, *supra*, 92 Cal.App.5th at p. 561.)  As discussed, we cannot conclude there is a reasonable probability the jury was misled by the given instructions, which accurately conveyed the applicable law.  For the same reasons, we cannot conclude defendant was prejudiced by his counsel's failure to request a pinpoint instruction that the test for determining whether provocation as sufficient to reduce first degree murder to second degree murder is subjective.  Rather, the given instructions, namely CALCRIM Nos. 521, 522, and 570, advised the jury of the elements of the crimes and no further instructions were necessary.  Said differently, we cannot conclude it is reasonably probable defendant would have obtained a more favorable verdict had the referenced pinpoint instruction been requested and given.  Thus, defendant's related ineffective assistance of counsel claim also fails.

We reject defendant's first contention.

## II.  Admission of Evidence of Uncharged Acts of Domestic Violence

Defendant next asserts the court prejudicially erred in permitting the prosecution to introduce evidence of defendant's alleged act of domestic abuse against his young daughter in violation of Evidence Code section 352.  We disagree.

### A.  Relevant Factual Background

During trial, the prosecutor explained she advised Daisy Vang during a break in her testimony that she should only testify about things she personally witnessed.  Daisy

then recounted to the prosecutor a domestic violence incident she observed in 2016 involving defendant's and the victim's daughter Je. Daisy stated she personally witnessed the daughter, who "was four or five years old, came out with a bloody nose and some red marks to her back after being hit by the defendant with a hanger." The victim was crying and emotional and she explained within moments of the child coming out of the house with the injuries that defendant had caused them.

The prosecutor asked "to be allowed to question her about that specific incident based on admitting it under [Evidence Code section] 1109 as well as a spontaneous statement." Defense counsel responded, based on the description, Daisy did not personally observe how the injury occurred and the evidence should be excluded under Evidence Code section 352 because it was not probative as to spousal homicide.

The court found a sufficient foundation and concluded "it would fall under [Evidence Code section] 1109" and "is … a spontaneous statement." The court noted the defense's Evidence Code section 352 objection and stated "from a position of relevancy … one of the critical issues in this case is … the defendant's character and reaction …. [H]e's been described on one hand as a violent controlling individual. And on the other hand as somebody who was very caring, a father and a husband, who [was] just at the end of his rope, concerning the homicide." "So this would be relevant for the jury to decide which one is the more accurate portrayal of the defendant. We'll show the defendant is objecting both on 352 and hearsay and 1109 grounds. So those objections are preserved."

Defense counsel requested an Evidence Code section 402 hearing with the witness. During the hearing, Daisy Yang testified, in 2016, she was outside of defendant's and the victim's home when the victim brought her daughter Je. outside. Daisy saw that the child had a bloody nose and bruises on her back that looked like marks from a clothes hanger; Je. was crying. The victim was distressed and emotional and she told Daisy that defendant had caused the injuries. Daisy was at their house about an hour earlier and she did not see injuries on Je. then. Daisy did not see defendant in the house

but knew he was there and had seen him that morning. Daisy testified she never saw defendant strike any of his children. Daisy also stated she did not recall but could have previously said the incident happened in December 2015 and that she witnessed defendant drinking and punch his four-year-old daughter on the nose, causing it to bleed.

Thereafter, defense counsel asserted he anticipated evidence that would "cast some doubt on Daisy Vang's veracity on some issues," noting, for example, Daisy testified she was unaware the victim was having an affair, but Daisy had told a police officer on the day of the homicide that her sister was seeing another man. He argued Daisy's testimony was "not consistent enough … as 1109 evidence." He asserted Daisy testified she saw the defendant, who had been drinking, punch his four-year-old daughter and "this other one where … though she didn't see anything … that [the victim] is being truthful about the daughter getting hit with a hanger." Defense counsel argued Evidence Code section 1109 evidence is normally considered with regard to whether the act the defendant was on trial for was committed, and "these stories that she's telling about him and his daughter, they don't go to that." He conceded it may go to other issues, such as that the defendant would lose his temper or snap, "[b]ut we don't really have evidence of that either."

The court agreed with defense counsel that Daisy Yang's "credibility is of crucial importance to the jury. So within … the parameters of 352 I'll allow her to be impeached." The court found significant that Daisy testified she was in the house earlier, defendant was present, and the child was not injured though the child came out of the house injured within an hour. "So there's also independent evidence establishing the credibility of the statement." The court concluded, "[U]nder [Evidence Code section] 1109 … it's clearly admissible. I always review and continue to review through the lens of [Evidence Code section] 352."

Daisy Yang then testified before the jury that, in the beginning of 2016, she was outside of the victim's and defendant's house when the victim took their four-year-old

daughter outside. The child had a bloody nose, bruises or marks on her back, and was crying. Daisy had seen the child an hour earlier and she did not have a bloody nose. The victim was crying and distressed and she told Daisy defendant caused the injuries. Daisy did not call the police since the victim would not have wanted her to report it: "Because [defendant] was the sole provider for the children." Daisy also testified, "[b]ased on [her] experience and [cultural] background it is a stigma for a wife or woman to call police over their partner, especially the husbands." She stated, in their culture, domestic issues were handled with the involvement of "the elderly and the leaders."

## B. Standard of Review and Applicable Law

Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.) But the Legislature has created exceptions to this rule in cases involving sexual offenses (*id.*, § 1108) and domestic violence (*id.*, § 1109.) The California Supreme Court has held that Evidence Code section 1108 conforms with the requirements of due process. (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.) And the analysis in *Falsetta* has been used to uphold the constitutionality of Evidence Code section 1109. (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1312; *People v. Price* (2004) 120 Cal.App.4th 224, 240–241.)

Evidence Code section 1109 provides (subject to certain exceptions not applicable here) that in a criminal domestic violence action, evidence of the defendant's commission of other domestic violence is not inadmissible character evidence under Evidence Code section 1101 if such evidence is not inadmissible pursuant to Evidence Code section 352. (Evid. Code, § 1109, subd. (a).)

Evidence Code section 352 affords the trial court discretion to exclude evidence if its probative value is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely

tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying Evidence Code section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Bolin* (1998) 18 Cal.4th 297, 320; see *People v. Mani* (2022) 74 Cal.App.5th 343, 371–372 ["'""""[T]he prejudice which exclusion of evidence under [Evidence Code] section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in [Evidence Code] section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues'""""""].)

"The admissibility of evidence of domestic violence is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion." (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.) "[T]he court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

### C. Analysis

Defendant asserts the court abused its discretion in admitting evidence of the prior act of domestic violence he allegedly committed against his daughter because the prejudicial impact of such evidence substantially outweighed its probative value. He argues, Daisy Yang's testimony regarding the purported uncharged incident of domestic violence against the child "was not corroborated" and involved his four-year-old daughter, whereas the charged incident involved his wife, so they lacked sufficient similarity. He notes the lack of a limiting instruction regarding the use of such evidence, and contends he was prejudiced by its admission, necessitating reversal. The People respond defendant has failed to establish the court abused its discretion or that he was

prejudiced by the admission of the challenged evidence. They contend the prior incident involving defendant's daughter was probative in showing defendant was abusive and violent toward his nuclear family absent provocation, and it "tended to undercut [defendant's] contention that he stabbed [the victim] solely due to her provocation." The People further assert the prior uncharged act evidence was also "probative because it helped blunt the defense's attempt to portray [defendant] as a caring and gentle father." They also argue Ge Her corroborated Daisy Yang's testimony that defendant had previously hit his daughter.

We cannot say the court abused its broad discretion in admitting evidence of defendant's alleged abuse of his daughter that took place within three months of the charged crime. That is, the court did not err in concluding the probative value of such evidence was not substantially outweighed by the probability its admission would create substantial danger of undue prejudice. (See Evid. Code, § 352.)

Such evidence was relevant to the disputed issues at trial, particularly in light of the positive character evidence presented by the defense. (See generally *People v. Brown*, *supra*, 192 Cal.App.4th at p. 1237 ["A defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder"].) The alleged incident involved the defendant acting violently against a member of his direct family with whom he lived, in the home, near in time to the charged offense. The fact the uncharged act was committed against defendant's daughter as opposed to his wife made it less likely the jury might confuse the prior act with the charged act. And contrary to defendant's contentions, the uncharged act, during which defendant allegedly gave his four-year-old daughter a bloody nose and marks on her body, even despite the child's age, was significantly less inflammatory than the circumstances of the charged offense which involved defendant repeatedly stabbing his wife all over her body in the presence of his three-year-old son until his wife was dead. (See *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119 ["Relevant factors in

33.

determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts"]; see also *People v. Brown* (2000) 77 Cal.App.4th 1324, 1338 [no abuse of discretion in admitting evidence of defendant's prior acts of domestic violence where such evidence was not inflammatory, was less serious than the charged act, did not consume much time at trial, and the prior acts were not remote in time].) Additionally, the referenced testimony by Daisy Vang was brief, encompassing just a few pages of an extensive trial record. And "contrary to the implication of defendant's argument, corroboration [of such evidence] is not a requirement," though it is a factor the trial court must consider in the Evidence Code section 352 analysis. (*People v. Mani*, *supra*, 74 Cal.App.5th at pp. 372–373; see generally Evid. Code, § 1109, subd. (d)(3) [noting admission of evidence of domestic violence is "[s]ubject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time"].) Nevertheless, Daisy's testimony was corroborated by the testimony of Ge Her, who testified when defendant was drunk, he got angry and "beat up the children." Ge Her further testified defendant once hit his daughter in the nose and it started bleeding. She stated she heard the child crying and came outside.

Furthermore, even if we were to conclude the court erred in admitting such evidence, which we do not, we cannot say defendant was prejudiced. That is, it is not reasonably probable that defendant would have obtained a more favorable result if evidence of this uncharged act had been excluded. Rather, the evidence defendant committed deliberate and premeditated murder was strong. The evidence, including defendant's own admissions, established defendant had abused and threatened to kill the victim even before the charged incident. He had even pulled a knife on her before. He had learned of the affair months before the killing and, on the night of the stabbing, he walked out of the room, retrieved a knife, returned to the room and repeatedly stabbed the

34.

victim with a plan to then kill himself, evidencing planning activity.  He told the victim that if he could not have her, he would not let her go, evidencing motive.  Additionally, defendant brutally stabbed the victim repeatedly and slit her throat, further supporting a conclusion the killing was deliberate, intentional, and premeditated.  (See *People v. Anderson* (1968) 70 Cal.2d 15, 26 [identifying "three basic categories" of evidence sufficient to sustain finding of premeditation and deliberation:  (1) planning activity, (2) motive, and (3) manner of killing].)  Thus, we conclude it is not reasonably probable that absent evidence of defendant's prior abuse incident related to his daughter, he would have obtained a more favorable result.

Accordingly, we reject defendant's contention.

## III. CALCRIM No. 852A

Defendant also asserts the court prejudicially erred by failing to instruct the jury, sua sponte, with CALCRIM No. 852A, which relates to evidence of uncharged domestic violence.  Again, we disagree.

### A. Standard of Review and Applicable Law

In the absence of a request, a trial court generally has no sua sponte duty to give a limiting instruction.  Under Evidence Code section 355, "[w]hen evidence is admissible … for one purpose and is inadmissible … for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly."  (Italics added.)  Under this provision, a court has no duty to give a sua sponte instruction limiting the purpose for which evidence may be considered.  (See *People v. Macias* (1997) 16 Cal.4th 739, 746, fn. 3; *People v. Collie* (1981) 30 Cal.3d 43, 63–64; accord, *People v. Dennis*, *supra*, 17 Cal.4th at p. 533.)  This principle has been held specifically to apply to limiting instructions regarding the admission of a defendant's previous uncharged misconduct, including on the use of evidence admitted under Evidence Code section 1109.  (*People v. Jennings*, *supra*, 81 Cal.App.4th at p. 1316; see *People v. Padilla*

(1995) 11 Cal.4th 891, 950–951, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

"There may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence. But …, in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct." (*People v. Collie*, *supra*, 30 Cal.3d at p. 64.)

**B.    Analysis**

Defendant argues the court "committed reversible error by failing to instruct the jury with CALCRIM No. 852A on the use and limited purpose of evidence of uncharged domestic violence." Specifically, he contends the jury should have been instructed with the following:

> "The People presented evidence that the defendant committed domestic violence against [the victim] and his daughter that was not charged in this case. [¶] Domestic violence means abuse committed against an adult who is a spouse or person with whom the defendant has had a child or against a child of the defendant. [¶] *Abuse* means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to herself or to someone else.

> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely.

> "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and,

36.

based on that decision, also conclude that the defendant was likely to commit the murder, as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or manslaughter. The People must still prove the charge and allegation beyond a reasonable doubt."

Defendant acknowledges a trial court generally does not have a sua sponte duty to give a limiting instruction regarding the use of other crimes evidence, but he contends such a duty arose here because this is an "extraordinary case" in which the evidence of prior domestic violence was a substantial part of the evidence and the prosecutor relied on such evidence to argue defendant was "not sufficiently provoked at the time he killed [the victim]." He further asserts the issue is not forfeited based upon his counsel's failure to request CALCRIM No. 852A because the absence of such an instruction affected his substantial rights to due process and a fair trial. He contends, "[i]f the jury had been properly instructed with CALCRIM No. 852A, it is reasonably probable that at least one juror would have concluded that not all of the incidents of prior domestic violence had been proven by a preponderance of evidence and that [defendant] had been sufficiently provoked so that he was only guilty of a lesser included offense of first degree murder." He argues he was prejudiced by the lack of such an instruction, noting the prosecutor relied on the prior domestic violence evidence during closing argument, arguing defendant did not act rashly but rather was "'a domestic violence abuser'" and not someone "'of average disposition.'" The People respond that defendant forfeited this claim by failing to request such an instruction below. They further contend the court had no sua sponte duty to give CALCRIM No. 852A, and defendant was not prejudiced by the lack of such an instruction.

Initially, we cannot conclude this is "an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose"

37.

(*People v. Collie*, *supra*, 30 Cal.3d at p. 64) such that the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 852A.  To the contrary, the evidence of defendant's prior acts against the victim were extremely relevant to the circumstances leading up to the murder and evidenced his escalating aggression toward her over time, which was a legitimate purpose for which the jury could consider it.  Notably, defendant, himself, corroborated the truth of much of the prior domestic violence allegations.  And, as the parties acknowledge, generally, the lack of a request for an instruction on use of uncharged offense evidence forfeits the issue on appeal.  Irrespective, we conclude defendant fails to establish prejudicial error.

First, we reject defendant's argument that the lack of such an instruction resulted in constitutional error.  An instructional error may be deemed to violate a defendant's constitutional rights where an element of the charged offense is misdescribed or the instructions are otherwise "'incomplete and misleading'" with respect to the findings necessary to prove an element of the offense.  (*People v. Schuller* (2023) 15 Cal.5th 237, 251.)  "The key inquiry is whether the instruction operated to 'preclude[] the jury from making a finding' [citation] on any fact necessary to establish an element of the offense." (*Ibid*.)  But here, the jury was correctly instructed on the elements of first degree murder, murder, and manslaughter.  The jury was further instructed that the prosecution bore the burden of proving defendant was guilty of a crime beyond a reasonable doubt. Accordingly, we cannot conclude the lack of an instruction pursuant to CALCRIM No. 852A affected defendant's constitutional rights; rather, the prosecution was required to prove each element of the murder charge beyond a reasonable doubt.  (See *People v. Jennings*, *supra*, 81 Cal.App.4th at p. 1317 ["The trial court in this case gave the proper reasonable doubt instructions.  No more was required of it"].)

"'"[M]isdirection of the jury, including incorrect, ambiguous, conflicting or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People v*.] *Watson*[, *supra*, 46

Cal.2d 818].'" [Citations.] "'[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

And here, we also cannot say it is reasonably probable defendant would have obtained a more favorable result if the court had instructed the jury with CALCRIM No. 852A. The court instructed the jury on reasonable doubt and stated: "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." It further instructed the jurors, "You must decide what the facts are. It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you during the trial." Additionally, "You alone must judge the credibility or believability of the witnesses. … You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." "You must decide the meaning and importance of character evidence." It also instructed the jury that "intent and mental state may be proved by circumstantial evidence. Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced beyond a reasonable doubt the People have proved each fact essential to that conclusion beyond a reasonable doubt."

Thus, the jury was tasked with independently determining whether the evidence presented should be believed, and it was repeatedly told it must determine whether the prosecution had proven defendant was guilty of the charged crime beyond a reasonable doubt. While defendant asserts not all of the prior domestic violence incidents were proven by a preponderance of the evidence, numerous witnesses testified regarding prior acts of abuse by defendant against the victim. Indeed, defendant himself admitted to slapping and punching the victim in the past, forcing her into a car against her will, and threatening to kill her before the charged incident. And, as discussed *ante*, the brief testimony regarding the incident during which defendant allegedly hit his daughter was

39.

corroborated and not overly inflammatory, particularly when compared to the circumstances of the charged offense, such that it would result in prejudice. Furthermore, while the prosecutor discussed defendant's prior acts of domestic violence in closing argument, she did not urge the jury to convict defendant of murder based solely on one or more of those acts. Rather, she relied on such evidence, as she was entitled, to explain the circumstances leading up to the killing.

Notably, in the portion of the closing argument defendant references, the prosecutor did not refer to defendant as a "domestic violence abuser." Rather, she was properly discussing the elements of manslaughter and explained it requires a finding that "the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. A person of average disposition. That is not a domestic violence abuser. That is not a person who follows the cultural norms of the Hmong culture. That is an average person." Furthermore, to the extent the jury believed the prior domestic abuse incidents occurred, they were permitted to infer that the prior offenses were probative as to defendant's propensity to commit the charged offense. Thus, we cannot conclude it is reasonably probable defendant would have obtained a more favorable result had the jury been instructed with CALCRIM No. 852A.

Nor can we conclude counsel was ineffective in failing to request the jury be instructed with CALCRIM No. 852A. Initially, the record does not affirmatively disclose that counsel had no rational tactical purpose in not requesting such an instruction. Indeed, he was not asked the reason and failed to provide one, and we cannot conclude this is a situation where there simply could be no satisfactory explanation. Rather, there were reasonable tactical reasons counsel may not have requested this instruction.

While CALCRIM No. 852A contains language that limits how jurors can use uncharged domestic violence evidence in determining whether a defendant is guilty of the charged offenses, counsel may have reasonably concluded the instruction would

40.

emphasize that the jury could use such propensity evidence to prove his guilt. Furthermore, counsel could have reasonably believed the jury would find the testimony and defendant's admissions to committing domestic violence against the victim, and Daisy Yang's testimony regarding the bloody nose incident involving defendant's daughter would more than meet the preponderance of the evidence standard for considering this evidence. Irrespective, we conclude it is not reasonably probable defendant would have obtained a more favorable result had such an instruction been given. Thus, defendant has failed to establish his counsel was ineffective in failing to request CALCRIM No. 852A.

Accordingly, we reject defendant's contentions.

## IV. Defendant Is Entitled to Additional Days of Custody Credits

Defendant initially argued he is entitled to an additional 51 days of custody credits. The People responded defendant is entitled to 50 additional days of presentence credit. On reply, defendant agrees with the People's calculation. We agree with the parties that defendant is entitled to 50 additional days of presentence custody credit.

Section 2900.5 provides for the application of custody credit to a defendant's term of imprisonment: "In all felony … convictions, … when the defendant has been in custody, … all days of custody of the defendant … shall be credited upon his or her term of imprisonment …." (*Id.*, subd. (a).) However, any person who is convicted of murder, as defined in section 187, cannot accrue conduct credits. (See § 2933.2.)

As the parties acknowledge, the probation report indicates defendant was entitled to 2,554 days of presentence custody credit, consisting of 2,554 days of actual credit, through March 7, 2023. But defendant was sentenced on April 26, 2023. The court did not address defendant's presentence custody credits during the sentencing hearing, but the abstract of judgment and minute order reflect the presentence custody credit amount set forth in the probation report—2,554 days.

41.

Because sentencing occurred on April 26, 2023, defendant is entitled to an additional 50 days of presentence credit. Accordingly, the abstract of judgment must be corrected to reflect defendant's custody credit at the time of sentencing.

## DISPOSITION

We direct the court to prepare an amended abstract of judgment and minute order reflecting defendant's additional custody credit. In all other respects, the judgment is affirmed.

PEÑA, Acting P. J.

WE CONCUR:

SNAUFFER, J.

DESANTOS, J.